**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                  )
**UNITED STATES OF AMERICA**          )
                                                  )
    **v.**                               )          **Criminal Action No. 10-256-08, -09 (RCL)**
                                                  )
**NOE MACHADO-ERAZO** *and*          )
**JOSE MARTINEZ-AMAYA,**              )
                                                  )
    **Defendants.**                   )
_____  )

<u>**MEMORANDUM OPINION**</u>

    Before the Court are the Motion [428] for Judgment of Acquittal or, in the Alternative, for New Trial filed by Defendant Jose Martinez-Amaya and the Motion [429] for Judgment of Acquittal and New Trial and Reconsideration of Severance filed by Defendant Noe Machado-Erazo.  After a lengthy jury trial, Machado-Erazo and Martinez-Amaya were found guilty of three offenses related to their involvement in the gang *La Mara Salvatrucha Trece* ("MS-13"). Making nearly identical arguments, they contend that the evidence at trial was insufficient to establish their guilt; that venue was not proper in the District of Columbia; and that their trial should have been severed from the trial of a third MS-13 co-defendant, Yester Ayala, who was also found guilty.[1]  Upon consideration of the Motions and supporting Memoranda, the Government's Consolidated Opposition [432], the entire record herein, and the applicable law, the Court will deny the Motions for the reasons set forth below.

## I.    BACKGROUND

    This case has, at times, encompassed as many as twenty defendants charged with offenses related to their involvement in MS-13.  Most have pled guilty, and others remain

---

[1] Ayala has not filed a motion for new trial or a post-trial motion for judgment of acquittal.

fugitives.  Machado-Erazo, Martinez-Amaya, and Ayala elected to proceed to trial.  Machado-Erazo and Martinez-Amaya (hereinafter "the defendants") were charged by Superseding Indictment with one count of conspiracy in violation of the Racketeer Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(d); one count of Murder in Aid of Racketeering ("VICAR murder"), 18 U.S.C. § 1959(a)(1); and one count of Possession of a Firearm During and in Relation to a Crime of Violence, 18 U.S.C. § 924(c)(1)(A).  *See* Superseding Indictment, ECF No. 330.  The Superseding Indictment also charged the defendants with the murder underlying the VICAR count as a special sentencing factor to be found by a jury.  *Id*. at 23 (Special Sentencing Factor Six).

The trial in this case lasted from June 18, 2013, until August 6, 2013.  Presentation of evidence lasted approximately fourteen court days, and the jury deliberated for eleven days.  The parties called approximately fifty witnesses and introduced over two hundred exhibits.  Among the government's evidence were consensual recordings of MS-13 meetings and wiretaps of calls among MS-13 members, including the three defendants.  The jury returned verdicts of guilty as to both defendants on all three counts.  Verdict Form 2–4, ECF No. 402.  The jury answered the special finding for both defendants in the affirmative, determining that both, "aided and abetted by others, . . . did feloniously, willfully, and of deliberately premeditated malice aforethought kill and murder Felipe Leonardo Enriquez."  *Id.* at 2, 4.  The jury also found that the pattern of racketeering activity agreed to by the defendants included (i) murder in violation of the D.C. Code or Maryland law; (ii) extortion in violation of the D.C. Code or Maryland law; and (iii) obstruction of justice.  *Id.* at 1–4.  However, the jury found that the pattern of racketeering activity did not include robbery, violation of federal narcotics laws, or witness retaliation or tampering.  *Id.*  The third co-defendant, Ayala, was also charged with participating in the same

RICO conspiracy; he was found guilty. *Id.* at 5. The jury found that Ayala agreed to the same three racketeering activities as Machado-Erazo and Martinez-Amaya, and it also returned guilty verdicts against Ayala as to two counts of VICAR murder and two counts of D.C. Code murder deriving from the killings of Luis Alberto Membreno-Zelaya on or about November 6, 2008, and of Giovanni Sanchez on or about December 12, 2008. *Id.* at 5–8.

Machado-Erazo and Martinez-Amaya filed timely renewed motions for judgment of acquittal, *see* Fed. R. Crim. P. 29(c)(1), and for a new trial, *see* Fed. R. Crim. P. 33(b)(2). In addition to their challenges to the sufficiency of the evidence, Martinez-Amaya and Machado-Erazo "renew" previously filed motions to dismiss based on improper venue and motions for severance.[2] Machado-Erazo Mot. 1; Martinez-Amaya Mot. 1.

## II. LEGAL STANDARDS

### A. Motion for a New Trial

Under Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Whether to grant a new trial is "committed to the sound discretion of the trial judge, [and is subject to reversal] only for abuse of discretion or misapplication of the law." *United States v. Reese*, 561 F.2d 894, 902 (D.C. Cir. 1977). The burden of demonstrating that a new trial would be "in the interest of justice" rests with the defendant. *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982). However, a new trial should be granted only if the error was not harmless and affected the defendant's substantial

---

[2] Specifically, Martinez-Amaya references the Motion to Dismiss for Improper Venue, ECF No. 185, and the Motion for Judgment of Acquittal Based on Improper Venue, ECF No. 386. *See* Martinez-Amaya Mot. 1. He also asserts that he "renews" the "motion to sever" without identifying any specific document. *Id.* Machado-Erazo seeks to "renew[ ]" the Motion to Dismiss for Improper Venue & Joinder, ECF Nos. 181 & 185, the Motion for Judgment of Acquittal Based on Improper Venue, ECF No. 387, Defendants' Motion to Sever Defendants, ECF No. 149, and Defendant Aguilar's Motion for Severance of Defendants and Counts, ECF No. 168. *See* Machado-Erazo Mot. 1.

rights. *United States v. Walker*, 899 F. Supp. 14, 15 (D.D.C. 1995) (*quoting United States v. Johnson*, 769 F. Supp. 389, 395–96 (D.D.C. 1991)). The inquiry is "whether the error itself had substantial influence." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Pursuant to Federal Rule of Criminal Procedure 52(a), harmless error—that is, "[a]ny error, defect, irregularity or variance which does not affect substantial rights"—shall be disregarded. Fed. R. Crim. P. 52(a). The government bears the burden of proving harmlessness. *United States v. Palmera Pineda*, 592 F.3d 199, 201 (D.C. Cir. 2010).

### B.  Motion for a Judgment of Acquittal

Under Rule 29(c) of the Federal Rules of Criminal Procedure, a defendant may renew a motion for a judgment of acquittal after a guilty verdict has been rendered. Fed. R. Crim. P. 29(c). The Court's review of the jury's verdict is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Washington*, 12 F.3d 1128, 1135–36 (D.C. Cir. 1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002). That is, a motion for judgment of acquittal should be granted only when "a reasonable juror must necessarily have had a reasonable doubt as to the defendant's guilt." *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983). The Court "must presume that the jury properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983); *see also United States v. Kayode*, 254 F.3d 204, 212–13 (D.C. Cir. 2001).

### III.  ANALYSIS

The Court addresses first the defendants' argument that the evidence at trial was insufficient to support the guilty verdicts and then turns to their venue and severance arguments.

### A.  Sufficiency of the Evidence

#### 1.  RICO Conspiracy

Count One of the Indictment charged Machado-Erazo and Martinez-Amaya and other named and unnamed MS-13 members with RICO conspiracy arising from their membership in MS-13 and their participation in gang-related activities.  *See* Superseding Indictment ¶ 16.   Each defendant argues that "the government failed to prove his participation" in the racketeering acts charged in Count One.   Machado-Erazo Mot. 5, Martinez-Amaya Mot. 4.   Specifically, Machado-Erazo and Martinez-Amaya contend that the government did not prove that they agreed to or were involved in murder, extortion, or obstruction of justice, which are the three racketeering acts that the jury found that the RICO conspiracy included.   Machado-Erazo Mot. 5–7, Martinez-Amaya Mot. 4–5.   In response, the government contends that the evidence was more than sufficient to support the jury's verdicts.   Opp. 4–5 (citing trial transcripts and trial exhibits).   The government emphasizes that a pattern of racketeering activity to support a RICO conspiracy charge can be shown through "any individual offense committed within the time frame of the indictment so long as it is related to the enterprise's activities."   *Id.* at 2–4 & 2 n.1.

18 U.S.C. § 1962(d) criminalizes conspiracy to violate the RICO Act.  Section 1962(c) of the RICO Act, which the defendants were charged with conspiring to violate, provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

A "pattern of racketeering activity . . . requires at least two acts of racketeering activity" no more than ten years apart.   18 U.S.C. § 1961(5).   Racketeering activity is defined in 18 U.S.C. § 1961(1) and includes, as relevant here, murder and extortion in violation of state law and obstruction of justice in violation of 18 U.S.C. § 1503.

The defendants focus their arguments in the instant motions on the racketeering acts, but the Court notes that the other elements of RICO conspiracy were met.  There is no doubt that MS-13 is a transnational criminal organization that qualifies as a RICO enterprise that affects interstate commerce, as other courts have recognized, *e.g.*, *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008), and as the evidence at trial showed, *e.g.*, June 18, 2013 P.M. Trial Tr. 6–49 & June 19, 2013 A.M. Trial Tr. 6–38 (background testimony of government expert witness about MS-13).  For example, Juan Diaz, an investigator with the National Civil Police of El Salvador who has seventeen years of experience investigating gangs, testified that MS-13 has approximately 17,000 members in El Salvador and that its leaders there direct the gang's operations in the United States, including in the greater Washington, D.C. area.  June 18, 2013 P.M. Trial Tr. 17, 19; June 19, 2013 A.M. Trial Tr. 10.  There are approximately 5,000 MS-13 members in the greater D.C. metropolitan area.  June 17, 2013 P.M. Trial Tr. 84.  Of the 20 MS-13 members charged in this case, most belonged to two subgroups, or "cliques," that have connections to El Salvador and are active in the D.C. area—Normandie Locos Salvatruchas (often called Normandie or NLS) or Sailors Locos Salvatruchas (often called Sailors or SLSW). *See, e.g.*, July 17, 2013 P.M. Trial Tr. 82–83 (testimony of Sgt. George Norris regarding MS-13 cliques in the D.C. metropolitan area).

The evidence at trial also established that Machado-Erazo and Martinez-Amaya were active MS-13 members—specifically, members of the Normandie clique with the gang nicknames Gallo and Crimen respectively.[3]  *See, e.g.*, Gov't Ex. 117A (photographs of Machado-Erazo's MS-13 tattoos); Gov't Ex. 118 (photographs of Martinez-Amaya's MS-13

---

[3] MS-13 members sometimes reversed the syllables in gang nicknames.  For example, Machado-Erazo was also known as "Lloga"—*i.e.*, Gallo with the syllables inverted.  *E.g.*, June 27, 2013 A.M. Trial Tr. 67.  Martinez-Amaya was called "Mecri" in addition to Crimen.  *E.g.*, July 9, 2013 A.M. Trial Tr. 79 ("Well, because he's called Mecri or Crimen. That is, you can call him by both words.").

tattoos); Gov't Ex. 138 (photograph of Machado-Erazo wearing "Normandie N.L.S." baseball cap).  Martinez-Amaya served as a leader of the Normandie clique and sometimes communicated with one of the MS-13 leaders in El Salvador, Moises Humberto Rivera-Luna, known by the nickname "Viejo Santos."  *See, e.g.*, July 9, 2013 A.M. Trial Tr. 80.  Machado-Erazo was one of the leaders of "La Hermandad," a program, or collection, of D.C.-area MS-13 cliques.  *See, e.g.*, Gov't Ex. 906 (transcript of MS-13 meeting, recorded by a confidential source, run by Machado-Erazo); Gov't Ex. 907 at 31 (transcript of additional meeting run by Machado-Erazo, including the statement: "I mean, the thing is that you always have to belong to Normandy, homie, not get careless and not deny the barrio.").

The Court thus turns to the defendants' arguments that there was no evidence that they agreed to or were involved in the three racketeering acts found by the jury.  As a threshold matter, the Court first addresses a legal argument that underlies all of the contentions raised by Machado-Erazo and Martinez-Amaya in the instant motions, including their venue and severance claims: that there was insufficient evidence linking their MS-13 activities as part of the Normandie clique to those committed by other alleged co-conspirators, particularly Ayala and the Sailors clique.

a.  There Was a Single, Overarching MS-13 Conspiracy

In pretrial motions and in the motions now before the Court, Machado-Erazo and Martinez-Amaya have asserted that, at best, the government has established the existence of several independent MS-13 conspiracies.  Thus, they argue, Machado-Erazo and Martinez-Amaya—Normandie clique members who were mostly active in Maryland—were not part of a conspiracy with MS-13 members in other cliques, in the District of Columbia or otherwise.  This supposed line of demarcation, if accepted by the Court, would mean: that Machado-Erazo and

Martinez-Amaya cannot be held accountable for acts committed by the other cliques, including Ayala's murders; that they should not have been charged in the District of Columbia; and that their trial should have been severed from Ayala's.

The Court rejects this argument and finds that the government introduced proof of a single, overarching conspiracy among MS-13 members in cliques in the greater Washington, D.C. metropolitan area. "The existence of a single conspiracy or multiple conspiracies is primarily a question of fact for the jury," and "[t]he verdict must be upheld if the evidence adequately supports a finding that a single conspiracy existed." *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1986). The D.C. Circuit has directed that courts should consider "a variety of factors" to determine "whether the conspiracy was single or multiple" and "which acts were committed in furtherance of the common conspiracy," including: (1) "whether the conspirators share a common goal," the "most important" factor; (2) "the degree of dependence inherent in the conspiracy;" (3) "the overlap of participants in the various operations claimed to comprise a single conspiracy." *Id.*; *United States ex rel. Miller v. Bill Harbert Int'l Constr. Co.*, 608 F.3d 871, 900 (D.C. Cir. 2010) (clarifying that the three-part *Tarantino* inquiry applies to all conspiracies, not just narcotics conspiracies).

Far from showing that the cliques function as separate entities, the evidence at trial showed that MS-13 cliques, including Normandie and Sailors, are interdependent units that share common goals and function as part of a single MS-13 hierarchy. The cliques operate essentially as franchises of MS-13, which has a three-tiered chain of command: (i) the leadership in El Salvador, called "la ranfla" or the "big homies;" (ii) programs, which are groups of smaller MS-13 cliques; and (iii) the cliques themselves. Within the cliques, there are three levels: (i) the leadership, generally one or two persons called "la palabra" (Spanish for "the word"), "el

corredor" (Spanish for "runner"), the "runner," or the "shot caller;" (ii) the "homeboys," who are regular gang members who have been initiated through the "jumping in" process; and (iii) "paisas," associates or friends of gang members who have not been jumped in. *See* June 18, 2013 P.M. Trial Tr. 9–10, 18–20, 22, 34.

The government also established the existence of a single overarching MS-13 conspiracy through evidence showing the unified MS-13 identity, rules, and operations shared by all members and cliques. *E.g.*, *id.* at 19–23 (testimony on operation of cliques and programs within MS-13 hierarchy). MS-13 members are all subject to the gang's leadership in El Salvador, and they share MS-13's gang signs and symbols (the "claw"), its colors (blue and white), its rules (paramount among them, kill chavalas and do not cooperate with law enforcement), its tattoos, and its rivalries (most notably, with 18th Street). *Id.* at 25–27. For example, Machado-Erazo and Martinez-Amaya both bore MS-13 tattoos. *See* Gov't Exs. 117A, 118. Members of MS-13 viewed all members of MS-13—all "home boys"—as brothers. *E.g.*, June 27, 2013 P.M. Trial Tr. 39–40 ("[W]hen you become MS-13, actually you become a home boy, you become [ ] a family.").

In addition to the proof that the cliques in this case were operating as part of a larger MS-13 conspiracy, the government introduced specific, direct evidence of coordination between D.C.-area cliques through the *La Hermandad* program, of which Machado-Erazo was the leader. *E.g.*, June 27, 2013 A.M. Trial Tr. 66–67; July 9, 2013 P.M. Trial Tr. 30–32 ("Hermandad is a new program, it's a new program that finds its birth in East Coast, and it was a new program that was going to begin here in Maryland."). Although there was evidence that the Sailors clique was not a formal part of *La Hermandad*, July 9, 2013 P.M. Trial Tr. 30, the government showed informal cooperation between Sailors and Normandie. For example, Ayala, a Sailors member,

sometimes attended Normandie meetings.  June 24, 2013 P.M. Trial Tr. 51–53.  Importantly, the two cliques were associated through the leadership of Rivera-Luna, a top MS-13 commander in jail in El Salvador, and through Dennis Gil-Bernardez, the shot caller for the Normandie clique. Gil-Bernardez was close with Ayala, who eventually become the second leader of Sailors.  *Id.* For example, Luis Manuel Moreno-Axume, a friend of Ayala's, originally sought to join Sailors but was steered to Gil-Bernardez by Ayala; Moreno-Axume eventually joined Normandie.  This cooperation continued in jail, where Machado-Erazo and Ayala associated.  *See* June 21, 2013 P.M. Trial Tr. 85–86 (testimony of cooperating witness Hector Diaz-Flores, former MS-13 member, that Machado-Erazo and Ayala fraternized in jail and that Machado-Erazo told Ayala that "the home boys had eaten chicken," meaning that fellow MS-13 members had killed someone).

Applying the *Tarantino* factors, the Court finds that there was sufficient evidence to sustain the jury's finding that a single conspiracy existed as charged in the Superseding Indictment.  *See Tarantino*, 846 F.2d at 1391.  Beginning with that premise, the Court turns to the defendants' challenge to the sufficiency of evidence regarding the pattern of racketeering activity.  First, the defendants misapprehend RICO conspiracy law to the extent that they argue that the government erroneously failed to establish their personal involvement in each racketeering activity.  *E.g.*, Martinez-Amaya Mot. 4–5 (arguing that there was no "proof of where or when the 'rents' Defendant Martinez Amaya allegedly agreed to or was involved in collecting occurred").  There is no requirement that the government show that each defendant personally agreed to or was even aware of each individual racketeering activity; the government need only show that the defendant "adopt[ed] the goal of furthering or facilitating the criminal

endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997).  The Supreme Court, rejecting the

argument advanced by the defendants here, explained:

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense . . . .  He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.
>
> . . .
>
> It makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense.

*Id.*; *see also United States v. Starrett*, 55 F.3d 1525, 1543–44 (11th Cir. 1995) ("The focus is on

the agreement to participate in the enterprise through the pattern of racketeering activity, not on

the agreement to commit the individual predicate acts.").

As stated above, there was ample evidence that Machado-Erazo and Martinez-Amaya

were committed members of MS-13 who, at times, functioned in leadership roles.  Accordingly,

in reviewing the record in regards to the pattern of racketeering activity, the Court's inquiry is

whether the government showed that the racketeering acts were related to the conspiracy joined

by the defendants—meaning "that the acts had the same or similar purposes, results, participants,

victims, or methods of commission" or were "otherwise interrelated by distinguishing

characteristics and [were] not isolated events."  Post-Trial Jury Instructions 23 (using language

derived from *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 244 (1989)).

### b.  First Racketeering Activity: Murder

The Superseding Indictment alleged that the pattern of racketeering activity charged in

Count One encompassed at least four acts of murder under District of Columbia law and

Maryland law.  Superseding Indictment ¶ 16(a).  The non-exclusive list of overt acts in the

Superseding Indictment included four murders:

> [1] The murder of Louis Alberto Membreno-Zelaya on or about
> November 6, 2008, in the District of Columbia;
>
> [2] The murder of Giovanni Sanchez on or about December 12,
> 2008, in the District of Columbia;
>
> [3] The murder of Luis Chavez Ponce on or about July 29, 2008 in
> Maryland;
>
> [4] The murder of Felipe Leonardo Enriquez on or about March
> 31, 2010, in Maryland.[4]

*Id.* ¶ 22(d), (h), (i), (oo).

The elements of first and second degree murder are substantially identical under D.C. and

Maryland law.  Both first and second degree murder require that the defendant cause the death of

the decedent; first degree murder is premeditated, deliberate murder, while second degree murder

is a homicide that is "unplanned or impulsive."  *See* D.C. Code §§ 22-2101, 22-2103 (2001); Md.

Code Ann., Crim. Law §§ 2-201, 2-204, 2-205, 2-206 (West 2002 & Supp.); *Bates v. United

States*, 834 A.2d 85, 93 (D.C. 2003); *Morris v. State*, 993 A.2d 716, 733 (Md. Ct. Spec. App.

2010).

The evidence at trial showed that murder, both threatened and actualized, is central to

MS-13's control over its members and its ability to intimidate non-members.  In fact, one motto

---

[4] Several days into deliberations, a jury note brought to the attention of the Court and parties a discrepancy between references to the date of the Enriquez murder in the Superseding Indictment (and, thus, in the verdict form).  *See* Jury Note, ECF No. 413.  In some instances, the Superseding Indictment alleged that the murder occurred "on or about March 31, 2010," Superseding Indictment ¶ 22(oo) (list of racketeering acts) & p. 23 (Special Sentencing Factor Six), while other instances stated "on or about March 28, 2010," *e.g.*, *id.* at pages 21–22 (Counts Eight & Nine).  The government attributed the inconsistency to an editing error, noting—correctly—that the evidence had shown that the murder occurred on March 28, but the body was not found until March 31.  *See, e.g.*, July 8, 2013 P.M. Trial Tr. 14–25 (testimony of Carlos Rivas, who found Enriquez's dead body mid-morning on March 31, 2010); Gov't Ex. 306 (cellular telephone records for March 28, 2010).  To respond to the jury's note, the Court re-read the jury instruction that states that the government need only prove "beyond a reasonable doubt that the offenses were committed on a date reasonably near the date or dates alleged" when the indictment charges that the offense occurred "on or about" a certain date.  *See* Aug. 2, 2013 Tr.

used by the gang is "kill, rape, and control." *See* June 18, 2013 P.M. Trial Tr. 46. MS-13 ensures absolute loyalty and obedience from its members through the threat of a "green light," which is an order for the member to be killed due to an infraction of gang rules, such as cooperating with law enforcement. *See* June 18, 2013 P.M. Trial Tr. 34–37 (background testimony of expert witness Juan Diaz on green lights). "MS-13 members are obligated, if they see a person that they know has a green light, to kill them," and failure to do so could be grounds for punishment with a green light. *Id.* Witnesses testified that the Normandie and Sailors cliques were aware of and bound by the green-light system. *E.g.*, June 20, 2013 P.M. Trial Tr. 71 (testimony of cooperating witness Nelson Fuentes, former MS-13 member, that "[Membreno-Zelaya] had a green light, and, you know, we did what we do."). MS-13 members were also bound to kill "chavalas," or rival gang members. *E.g.*, July 9, 2013 A.M. Trial Tr. 76 (testimony of cooperating witness Jose Solorzano, former MS-13 member: "Q. What, if anything, did the Normandie clique do to chavalas? A. Well, we would kill them.").

In addition to demonstrating that murder was an important instrument of external and internal control for the gang, the evidence at trial established that the four murders alleged as overt acts listed in the Superseding Indictment were carried out to serve MS-13's goals.

*The murder of Louis Alberto Membreno-Zelaya on or about November 6, 2008*: Membreno-Zelaya, whose gang nickname was Brujo, was a member of the Sailors clique. He was killed by a group of MS-13 members from the Sailors clique, including Ayala, in the District of Columbia on November 6, 2008, pursuant to a green light issued because Membreno-Zelaya had removed his MS-13 tattoos. *E.g.*, June 21, 2013 P.M. Trial Tr. 4–13 (testimony of cooperating witness Carlos Silva, former head of the Sailors clique).

*The murder of Giovanni Sanchez on or about December 12, 2008*:  Sanchez was stabbed to death in the Columbia Heights area of Washington, D.C. by MS-13 members, including Ayala, because Sanchez was a chavala—a member of NFL, a rival gang to MS-13.  *E.g.*, June 25, 2013 A.M. Trial Tr. 16–37.

*The murder of Luis Chavez Ponce on or about July 29, 2008*: Ponce was shot by Dennis Gil-Bernardez (nickname Pando), the shot caller of the Normandie clique, on July 29, 2008 in Riverdale, Maryland, while Ponce was riding a bicycle.  Gil-Bernardez believed that Ponce was a chavala who had threatened an MS-13 member's sister-in-law.  *E.g.*, June 24, 2013 P.M. Trial Tr. 47–50 (testimony of cooperating witness Antonio Urrutia Barrera, former MS-13 member).

*The murder of Felipe Leonardo Enriquez on or about March 31, 2010*: As discussed in further detail *infra* regarding the VICAR murder and firearms counts, Machado-Erazo and Martinez-Amaya shot Enriquez in a wooded area in Maryland pursuant to an order from MS-13 leadership because the leaders suspected that Enriquez had falsely claimed to have been an MS-13 member in Guatemala and because Enriquez had violated gang rules by, *inter alia*, bringing a weapon to a clique meeting.  *See infra* § III.A.2.

### c. Second Racketeering Activity: Extortion

The Superseding Indictment charged that the RICO conspiracy involved extortion in violation of D.C. and Maryland law.  Superseding Indictment ¶ 16(c).  Both jurisdictions proscribe obtaining property from another by actual or threatened force or economic harm.  D.C. Code § 22-3251 (2001); Md. Code. Ann., Crim. Law §§ 3-701, 3-705 (West 2002 & Supp.); *Rendelman v. State*, 927 A.2d 468, 435 (Md. Ct. Spec. App. 2007) (Maryland law "punishes the extortive threat, not the actual attainment of money (or thing of value)").

The government introduced evidence supporting the jury's finding that the RICO conspiracy included an agreement to commit extortion.  One of MS-13's primary methods for controlling territory is threatening physical harm to force illicit businesses operating in the area to pay "rent" or "taxes" to the gang.  *E.g.*, June 20, 2013 P.M. Trial Tr. at 54–57 (testimony of cooperating witness Nelson Fuentes, former MS-13 member, about collecting "rent" from drug dealers or pimps, stating: "Q. . . . [W]hat if somebody didn't want to pay the taxes, what did you do? A. We tell them that we're going to hurt them, you know, we're going to shoot them or even kill them."); June 21, 2013 P.M. Trial Tr. at 26 (testimony of cooperating witness Carlos Silva, former MS-13 member, about his arrest at a bordello while "[t]rying to make them pay rent"). Although the involvement of co-conspirators in extortion is sufficient, there was evidence that Machado-Erazo himself collected rent on his clique's behalf.  *E.g.*, July 16, 2013 A.M. Trial Tr. 25 (testimony of cooperating witness Luis Avila-Melendez, former MS-13 member: "Q. From where did Gallo collect rent? A. From the brothels and the drug dealers.").

### d. Third Racketeering Activity: Obstruction of Justice

The Superseding Indictment charged that the pattern of racketeering activity included acts constituting obstruction of justice in violation of federal law.  Superseding Indictment ¶ 16(f).  As relevant here, 18 U.S.C. § 1503(a) provides: "Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished [pursuant to 18 U.S.C. § 1503(b)]."  Section 1503(a) "is intended to cover all endeavors to obstruct justice;" it requires the government to prove "that there was a pending judicial proceeding, the defendant had knowledge or notice of the pending proceeding, and the defendant

acted corruptly with the specific intent to obstruct or impede the proceeding or the due administration of justice." *United States v. Neal*, 951 F.2d 630, 632 (5th Cir. 1992).

The evidence at trial indisputably supported the jury's finding that the pattern of racketeering activity agreed to by the conspirators included obstruction of justice. For example, Karen Silva, the sister of lead defendant Carlos Silva (MS-13 nickname Cangri), was kidnapped in San Salvador, El Salvador, in August 2011, after Carlos Silva had entered into a plea agreement in this case. June 24, 2011 A.M. Trial Tr. 13–24; Gov't Ex. 1504b (Carlos Silva plea agreement). Karen Silva escaped her captors, but she later received a note stating:

> Cangri's sister, your mother already received her warning. You escaped the first time in the truck. The next time you won't escape. You all tell Cangri to shut his mouth. Your children are going to pay for it. It depends on Cangri. Otherwise, everyone is going to die. You don't know who you all are messing with.

June 24, 2011 A.M. Trial Tr. 13–24; *see also* Gov't Exs. 135, 135a (note to Karen Silva and translation). Gloria Silva, Carlos and Karen's mother, also received a note that stated, in relevant part: "[T]ell him that if he opens his mouth with the gringos, we're going to kill his whole family. You know that we stole the truck, and by the luck of an idiot of one of ours, you escaped. We were going to kill you and burn it in the truck. What we say we do." June 21, 2013 P.M. Trial Tr. 66–75; *see also* Gov't Exs. 136 & 136a (note to Gloria Silva and translation). Ms. Silva further testified that she received the note shortly after Karen Silva was kidnapped but escaped her captors. June 21, 2013 P.M. Trial Tr. 66–75.

The record also included evidence of direct involvement of the defendants in obstruction of justice. For example, after the Sanchez murder, Ayala told Hector Diaz-Flores, a Normandie clique member and co-defendant, that if Diaz cooperated with the government, Ayala would kill him too. June 21, 2013 P.M. Trial Tr. 80–81. Ayala and Machado-Erazo then attempted to

dissuade Diaz-Flores from pleading guilty in an "aggressive" and "rough" manner because of the effect it would have on Ayala's case.  *Id.*

### e.  Conclusion

Based on the foregoing, the evidence amply supported the jury's guilty verdicts on RICO conspiracy as to Machado-Erazo and Martinez-Amaya as well as its findings that the pattern of racketeering activity agreed to by the defendants included murder, extortion, and obstruction of justice.

### 2.  *VICAR Murder and Firearm Charge*

The jury found Machado-Erazo and Martinez-Amaya guilty of VICAR murder and possession of a firearm during or in furtherance of commission of a crime of violence for the killing of Felipe Enriquez on or about March 28, 2010.  Verdict Form 2, 4.  The defendants argue that "the jury's finding was irrational and not based on the evidence presented" because the government did not prove that they "committed the shooting" or that they did so "for the purpose of joining, remaining with, or increasing a position" within MS-13.  Machado-Erazo Mot. 7–8; Martinez-Amaya Mot. 5.   The government's response is straightforward: "[T]hrough the testimony of Manuel Saravia and others, the government showed that the defendants[,] acting together[,] killed Felipe Enriquez with a firearm pursuant to a 'green light'"—that is, an authorization from the gang to execute a member who had breached its rules.  Opp. 4 (citing June 27, 2013 A.M. Trial Tr. at 73–75, 87).

18 U.S.C. § 1959, the VICAR statute, reads as follows:

> Whoever, for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires to do so [is guilty of a crime].

The Superseding Indictment charged that the Enriquez killing constituted murder under Maryland law. *See* Superseding Indictment 21 (Count Eight). Thus, to establish the defendants' guilt for VICAR murder, the government had to show five elements: (1) that MS-13 was a RICO enterprise; (2) that MS-13 was engaged in racketeering activity; (3) that the defendants had a position in MS-13; (4) that they committed or aided and abetted murder in violation of Maryland law; and (5) that their general purpose in doing so was to maintain or increase their position in MS-13. *See United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992) (listing elements of VICAR offense). For the reasons discussed *supra* regarding the RICO conspiracy charges, the first three elements were met, and the Court proceeds directly to analyzing the last two.

Under Maryland law as relevant here, first degree murder is "a deliberate, premeditated, and willful killing." Md. Code Ann., Crim. Law § 2-201(a)(1) (West 2002 & Supp.).[5] The government must prove that the defendant caused the death of the decedent and acted with deliberation, premeditation, and willfulness. *See Brooks v. State*, 655 A.2d 1311, 1315 (Md. Ct. Spec. App. 1995). "All other kinds of murder are murder in the second degree." *Hook v. State*, 553 A.2d 233, 234–35 (Md. 1989); Md. Code Ann., Crim. Law § 2-204 (West 2002 & Supp.). Second degree murder requires the government to prove that the defendant caused the death of the decedent and that the defendant engaged in the deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result. *Thornton v. State*, 919 A.2d 678, 687–96 (Md. 2007). Maryland law also proscribes attempted first degree murder, Md. Code Ann., Crim. Law § 2-205, and attempted second degree murder, *id.* § 2-206.

Viewed in the light most favorable to the government, the evidence showed that Machado-Erazo and Martinez-Amaya drove Enriquez, also known as Zombie, to a remote

---

[5] Other types of murder also qualify as first-degree murder under Maryland law, such as murder committed by poisoning and felony murder. *See* Md. Code Ann., Crim. Law § 2-201(a)(3), (4) (West 2002 & Supp.).

wooded area in the D.C. suburbs in Maryland near the Patuxent River, where they shot him to death.  Enriquez had been green-lit because other gang members doubted whether he had truly been a member of MS-13 in Guatemala, as he claimed.  Enriquez also brought a knife to a clique meeting, in violation of gang rules barring weapons at meetings.  When Rivera-Luna learned that Machado-Erazo had not disciplined Enriquez, Rivera-Luna became angry and directed Machado-Erazo to kill Enriquez.  June 27, 2013 A.M. Trial Tr. 56–90 (testimony of cooperating witness Manuel Saravia, former MS-13 member); June 27, 2013 P.M. Trial Tr. 13–14, 19, 64–65 (same); *see also* Gov't Ex. 906 (transcript of March 6, 2010 clique meeting in which Machado-Erazo instructs Enriquez on how Normandie operates); Gov't Ex. 924 (transcript of March 7, 2010 telephone call in which Martinez-Amaya and Jorge Solorzano discuss Rivera-Luna's anger regarding Enriquez).  Specifically, Martinez-Amaya told Saravia that Machado-Erazo shot Enriquez first, and when Machado-Erazo was "scared to keep shooting," Martinez-Amaya took the gun and fired additional shots.  June 27, 2013 A.M. Trial Tr. 87–88.  The evidence, including photographs of where the body was found, autopsy photographs, and shell casings recovered from the scene, showed that Enriquez was shot to death.  *See* Gov't Exs. 801–21.  The evidence introduced by the government, including of conversations among MS-13 members prior to Enriquez's killing, firmly supports the jury's finding that Machado-Erazo and Martinez-Amaya killed Enriquez to assuage Rivera-Luna's anger and thus "maintain or increase" their position in the gang.  *See, e.g.*, July 11, 2013 A.M. Trial Tr. 21–28 (testimony of cooperating witness Jorge Solorzano regarding clique meeting at which Enriquez had a weapon, discussion with Machado-Erazo, phone call with Rivera-Luna, and subsequent phone call with Martinez-Amaya).  On the basis of this evidence, the jury could have reasonably concluded that Machado-Erazo and Martinez-Amaya murdered Enriquez "for the purpose of gaining entrance to or maintaining or

increasing position in" MS-13, "an enterprise engaged in racketeering activity," satisfying the requirements of VICAR murder.  *See* 18 U.S.C. § 1959.

Count Nine charged the defendants with possession of a firearm during and in relation to the crime of violence charged in Count Eight—the Enriquez murder—in violation of 18 U.S.C. § 924(c).  *See* Superseding Indictment 22.  Section 924(c) creates an additional offense beyond the commission of the underlying crime for "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm."  The murder charged in Count Eight is a "crime of violence" because it is a felony that requires "the use, attempted use, or threatened use of physical force" against another person." *See* 18 U.S.C. § 924(c)(3)(A) (defining "crime of violence").  Thus, the government bore the burden to show three elements beyond a reasonable doubt: (1) each defendant used or possessed a firearm, or aided and abetted the use or possession of a firearm; (2) each defendant did so knowing and intentionally; and (3) each defendant did so during and in relation to the Enriquez murder.  *See United States v. Toms*, 136 F.3d 176, 180 (D.C. Cir. 1998); *United States v. Harrington*, 108 F.3d 1460, 1471 (D.C. Cir. 1997) (aiding-and-abetting liability under § 924(c) requires "evidence showing that the defendant knew to a practical certainty that the principal would 'use' a weapon in the ways prohibited by section 924(c)" (internal quotation marks, citation, and modification omitted)).  As discussed in the immediately preceding paragraph, there was more than sufficient evidence to support the jury's guilty verdicts on VICAR murder, and the evidence showed that Enriquez was killed with a firearm—a nine-millimeter handgun.  *See* June 27, 2013 A.M. Trial Tr. 88 (testimony of cooperating witness Manuel Saravia, former MS-13 member, regarding nine-millimeter weapon used in shooting by Machado-Erazo and Martinez-Amaya); *id.* at 36 (testimony of crime-scene technician that nine-millimeter casings

were recovered from scene of Enriquez murder); Gov't Exs. 816, 816(a)–(h) (casings).  Thus, the evidence supported the jury's verdicts on Count Nine.

### 3. Conclusion—Sufficiency of the Evidence

After viewing the evidence in the light most favorable to the prosecution, the Court concludes that the jury could have found that the government showed beyond a reasonable doubt the essential elements of all counts of which the defendants were found guilty.  *See Washington*, 12 F.3d at 1135–36.  Thus, the defendants are not entitled to a new trial or a judgment of acquittal based on their challenges to the sufficiency of the evidence.

## B. Venue

The Court next addresses the defendants' argument that venue was improper in the District of Columbia because "[b]y the evidence produced at trial, the crimes of RICO Conspiracy, murder in aid of racketeering and possession of a firearm during and in relation to a crime of violence, all occurred in the State of Maryland."[6]  *See* Martinez-Amaya Mot. J. Acquittal, ECF No. 386, ¶ 1.  The government argues that venue was proper in the District of Columbia notwithstanding the involvement of Machado-Erazo and Martinez-Amaya in a murder in Maryland because the RICO conspiracy charged in the Superseding Indictment was a continuing offense that took place, in part, in the District of Columbia.  Opp. 5.

"Unless a statute or [the Federal Rules of Criminal Procedure] permit otherwise, the government must prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18.  When the offense is "begun in one district and completed in another, or committed in more than one district," the government may prosecute "in any district in which such offense

---

[6] The Court reserved ruling until trial on the pretrial motions challenging venue.  *See* Feb. 20, 2013 Order, ECF No. 296.  After the close of evidence, the Court then denied those motions, as well as a venue motion filed during trial. *See* July 18, 2013 P.M. Trial Tr. 54; July 18, 2013 Minute Order.

was begun, continued, or completed." 18 U.S.C. § 3237(a). In a conspiracy prosecution, venue is proper in any district in which any overt act in furtherance of the conspiracy was committed by any co-conspirator. *United States v. Brodie*, 524 F.3d 259, 273 (D.C. Cir. 2008). "The defendant need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there." *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) (citing *Hyde v. United States*, 225 U.S. 347, 362–63 (1912)).

While Machado-Erazo and Martinez-Amaya murdered Felipe Enriquez in Silver Spring, Maryland, the Court has already rejected their argument that their involvement with MS-13 was limited to a narrow conspiracy that took place in Maryland alone. *See supra* § III.A.1.a. Machado-Erazo and Martinez-Amaya were part of a RICO conspiracy that spanned Maryland, the District of Columbia, and Virginia. Overt acts in support of the conspiracy were committed in each of those jurisdictions. In fact, as discussed above, two of the murders charged in the case took place just blocks apart in the Columbia Heights section of the District of Columbia. Venue was thus proper in the District of Columbia under 18 U.S.C. § 3237(a).

## C. Severance

While Martinez-Amaya's bare reference to renewing a motion to sever is the extent of his argument on severance, Machado-Erazo adds that the Court should "reconsider the motion for severance" because "Mr. Machado-Erazo and Mr. Yester Ayala no [sic] only did not know each other but were never involved in any same or similar conspiracy."[7] Machado-Erazo Mot. 8. In

---

[7] It is not immediately apparent that the defendants preserved the specific argument that their trials should be severed from Ayala's. Ayala was not added to this case until the Superseding Indictment was filed on May 9, 2013. Both severance motions referenced by Machado-Erazo were denied months prior to that date. One motion Machado-Erazo references, ECF No. 168, was denied as moot on February 22, 2013 because no remaining defendant was pursuing it. *See* Feb. 20, 2013 Order, ECF No. 296. The other severance motion referenced, ECF No. 149, was denied without prejudice on March 5, 2013. *See* March 5, 2013 Order, ECF No. 305. There is no record of either Machado-Erazo or Martinez-Amaya renewing those motions or objecting to a joint trial with Ayala specifically. Nonetheless, the Court assumes *arguendo* that the argument was preserved.

its opposition, the government argues that severance was not required because RICO "allow[s] for the prosecution in one case of many different criminal acts committed by the same criminal enterprise."  Opp. 6 (citing *United States v. Irizarry*, 341 F.3d 273, 293 n.7 (3d Cir. 2003)).

### 1.  Joinder Was Proper

Joinder of defendants and offenses in multi-defendant cases is governed by Federal Rule of Criminal Procedure 8(b), which provides in part: "The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b); *United States v. Wilson*, 26 F.3d 142, 153 n.4 (D.C. Cir. 1994).  Rule 8(b) "may not be read to embrace similar or even identical offenses, *unless* those offenses are related. . . . There must be a logical relationship between the acts or transactions within the series." *United States v. Nicely*, 922 F.2d 850, 853 (D.C. Cir. 1991) (citing *United States v. Perry*, 731 F.2d 985, 990 (D.C. Cir. 1984)).  "Joint trials are favored in RICO cases."  *United States v. Richardson*, 167 F.3d 621, 624 (D.C. Cir. 1999).  There was a logical relationship among the offenses with which Machado-Erazo, Martinez-Amaya, and Ayala were charged because each defendant was charged with participation in the same RICO conspiracy in Count One of the Superseding Indictment. The other offenses charged were related to the defendants' alleged furtherance of the conspiracy through gang-related activities.  Accordingly, joinder was proper under Rule 8(b).

### 2.  Severance Was Not Required

Even when joinder of defendants and offenses is proper under Rule 8(b), a court may sever defendants or counts, or "provide any other relief that justice requires," if the joinder "appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a).  The Supreme Court has instructed that "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would

compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The Court suggested that such risk is "heightened" when, for example, "many defendants are tried together in a complex case and they have markedly different degrees of culpability" or when evidence "that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id.* Accordingly, "[s]everance may be required . . . when the evidence against one defendant is far more damaging than the evidence against the other defendant[s]." *United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991) (internal quotation marks omitted); *see also United States v. Richardson*, 167 F.3d 621, 624 (D.C. Cir. 1999). The critical question is "whether a jury could reasonably compartmentalize the evidence introduced against each individual defendant." *Id.* In any event, measures less drastic than severance, such as limiting instructions, often suffice to cure any risk of prejudice. *Zafiro*, 506 U.S. at 539. The trial court "has a continuing duty at all stages of the trial to grant a severance if prejudice does appear." *Schaffer v. United States*, 362 U.S. 511, 516 (1960); *Perry*, 731 F.2d at 992.

The Court concludes that the joint trial did not prejudice the defendants. As discussed above, although Machado-Erazo and Martinez-Amaya were members of a different MS-13 clique than Ayala, all three were part of a single conspiracy that served the greater goals of MS-13, most centrally using violence to achieve uniformity and loyalty among its members and control over persons in gang-controlled areas. The Enriquez murder, committed by Machado-Erazo and Martinez-Amaya in Maryland, and the Membreno-Zelaya murder, committed by Ayala in the District of Columbia, demonstrate that principle perfectly: Enriquez and Membreno-Zelaya were both gang members executed by other MS-13 members, on orders from superiors, because of concerns over their commitment to MS-13. Moreover, there was little danger of

prejudice because the evidence of the non-conspiracy offenses with which each defendant was charged was easily compartmentalized—there was no overlap between the Enriquez murder, the Sanchez murder, or the Membreno-Zelaya murder.  "The few cases in which [the D.C. Circuit has] overturned a trial court's denial of a motion to sever have involved clear disparities between the weight, quantity, or type of the evidence against the movant and against the other defendants."  *Halliman*, 923 F.2d at 884.  No such disparities were present here, and the defendants did not suffer prejudice from a joint trial.

## IV.  CONCLUSION

The defendants have shown neither that the jury's guilty verdicts were unsupported by the evidence nor that the trial was afflicted by error affecting their substantial rights.  Therefore, the defendants are not entitled to a judgment of acquittal, nor does the interest of justice require that the Court grant them a new trial.  The motions filed by Machado-Erazo and Martinez-Amaya will be denied.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, U.S. District Judge, on October 1, 2013.